Nos. 12-2339 and 12-2354

IN THE UNITED STATES COURT OF APPEALS
FOR THE SEVENTH CIRCUIT

ERIC SILVERMAN, On Behalf of Himself
and All Others Similarly Situated, et al.,
*Plaintiffs-Appellees*,

vs.

MOTOROLA, INC., et al.,
*Defendants*,

APPEALS OF:   PAUL A. LILES and
EDWARD FALKNER

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division
District Court No. 1:07-cv-04507
The Honorable Amy J. St. Eve

PLAINTIFFS-APPELLEES' CONSOLIDATED ANSWERING BRIEF

ROBBINS GELLER RUDMAN
  & DOWD LLP
JAMES E. BARZ (IL Bar # 6255605)
200 South Wacker Drive, 31st Floor
Chicago, IL  60606
Telephone:  312/674-4674
312/674-4676 (fax)

ROBBINS GELLER RUDMAN
  & DOWD LLP
MICHAEL J. DOWD
TOR GRONBORG
JOSEPH D. DALEY
TRIG R. SMITH
655 West Broadway, Suite 1900
San Diego, CA  92101
Telephone:  619/231-1058
619/231-7423 (fax)

Counsel for Plaintiffs-Appellees

758145_1

**CIRCUIT RULE 26.1  DISCLOSURE STATEMENT**

Appellate Court No: 12-2339 and 12-2354

Short Caption: Eric Silverman v. Motorola, Inc.

To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party or amicus curiae, or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R.  App. P. 26.1.

The Court prefers that the disclosure statement be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

**[   ]     PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH  INFORMATION IS NEW OR REVISED.**

(1)  The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P 26.1 by completing item #3):

Macomb County Employees' Retirement System; City of St. Clair Shores Police and Fire Retirement System;

Eric Silverman (replaced as an active litigant by appointment of lead plaintiff on October 16, 2007,

and deceased May 11, 2010)

(2)  The names of all law firms whose partners or associates have appeared for the party in the case (including  proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

Robbins Geller Rudman & Dowd LLP; Miller Law LLC; and Vanoverbeke Michaud & Timmony, P.C.

(3)  If the party or amicus is a corporation:

i)  Identify all its parent corporations, if any; and

N/A

ii)  list any publicly held company that owns 10% or more of the party's or amicus' stock:

N/A

Attorney's Signature: s/ Joseph D. Daley                    Date: June 18, 2012

Attorney's Printed Name: Joseph D. Daley

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).   **Yes**  X     **No**  _____

Address:  Robbins Geller Rudman & Dowd LLP

655 W. Broadway, Suite 1900, San Diego, California 92101

Phone Number: 619-231-1058                    Fax Number: 619-231-7423

E-Mail Address: jdaley@rgrdlaw.com

rev. 01/08 AK

## CIRCUIT RULE 34(f)
## STATEMENT REGARDING ORAL ARGUMENT

Plaintiffs-Appellees respectfully assert that the district court's opinion demonstrates on its face a sound exercise of discretion justifying affirmance, and thus may not require additional argument beyond that contained in the parties' briefs. Nonetheless, Plaintiffs-Appellees welcome oral argument if the Court so desires.

758145_1

# TABLE OF CONTENTS

**Page**

I.    JURISDICTIONAL STATEMENT ............................................................1

II.   STANDARDS OF REVIEW...................................................................1

III.  COUNTERSTATEMENT OF THE ISSUES ................................................2

IV.   COUNTERSTATEMENT OF THE CASE ...................................................3

    A.    Nature of the Case ..................................................................3

    B.    Course of Proceedings and Disposition Below ...................................6

V.    COUNTERSTATEMENT OF RELEVANT FACTS.........................................8

    A.    A Brief Summary of the Underlying Litigation....................................8

    B.    Settlement Negotiations ............................................................9

    C.    The Court-Approved Class Notice Is Directed to Class
        Members...............................................................................11

    D.    Plaintiffs Move for Final Approval of the Settlement and Class
        Counsel's Fee .......................................................................13

    E.    The District Court Approves the Settlement, Plan of Allocation,
        and Class Counsel's Fee, and Rejects the Appellants'
        Objections...........................................................................15

        1.    The District Court's Rejection of Liles's Objection.................15

        2.    The District Court's Rejection of Falkner's Objection.............17

        3.    Considering This Court's *Synthroid I* Factors, the District
            Court Approves Class Counsel's Fee Award ...........................20

VI.   SUMMARY OF ARGUMENT...................................................................22

VII.  ARGUMENT.......................................................................................26

- ii -

758145_1

**Page**

A.  Objector Liles Lacks Standing to Appeal Class Counsel's Fee; Alternatively, He Has Waived Any Fee Challenge ...........................26

    1.  Liles Has No Redressable Injury .............................................26

    2.  Liles's Arguments Below Concerned the Class Notice, Thus Waiving Any Fee Appeal..................................................28

B.  Because the PSLRA's Plain Text Does Not Require the Parties to Provide Damage Estimates When They Cannot Agree Upon Them, Liles's Remaining Objection Fails ...........................................29

C.  The District Court Did Not Abuse Its Discretion in Awarding Class Counsel their Attorneys' Fee in Accordance with the *Synthroid I* Factors ..............................................................................38

    1.  The PSLRA Does Not Require an *Ex Ante* Agreement, and Falkner Ignores the District Court's Inherent Duty to Determine a Fee's Reasonableness..........................................39

    2.  The District Court Conducted a Proper Market-Rate Inquiry Under this Court's Precedents....................................41

    3.  This Court Rejects Arbitrary Fee Caps....................................53

    4.  Falkner's Cherry-Picked Cases Containing Lower Percentages Are Inapposite........................................................54

    5.  The District Court Acted Within Its Discretion in Choosing Not to Do a Lodestar Cross-Check...........................58

VIII.  CONCLUSION..............................................................................61

# TABLE OF AUTHORITIES

**Page**

## CASES

*Allen v. Wright,*
   468 U.S. 737 (1984)...................................................................26

*Bass v. Stolper, Koritzinsky, Brewster & Neider, S.C.,*
   111 F.3d 1322 (7th Cir. 1997) ...............................................40

*Bill's Coal Co. v. Bd. of Public Utils.,*
   887 F.2d 242 (10th Cir. 1989) ................................................2

*Cook v. Niedert,*
   142 F.3d 1004 (7th Cir. 1998) ...........................48, 58, 59

*Domka v. Portage Cty.,*
   523 F.3d 776 (7th Cir. 2008) ................................................29

*Duncan v. Walker,*
   533 U.S. 167 (2001)..............................................................33

*Estate of Borst v. O'Brien,*
   979 F.2d 511 (7th Cir. 1992) ........................................1, 61

*Feder v. Elec. Data Sys. Corp.,*
   248 F. App'x 579 (5th Cir. 2007).........................................27

*Florin v. Nationsbank, N.A.,*
   34 F.3d 560 (7th Cir. 1994) ...........................22, 26, 58

*Harman v. Lyphomed, Inc.,*
   945 F.2d 969 (7th Cir. 1991) ................................................1

*Hensley v. Eckerhart,*
   461 U.S. 424 (1983)..............................................................40

*Hubbard v. BankAtlantic Bancorp, Inc.,*
   No. 11-12410, 2012 U.S. App. LEXIS 15134
   (11th Cir. July 23, 2012)......................................................45

758145_1

**Page**

*In re Am. Int'l Grp.*,
    452 F. App'x 75 (2d Cir. 2012) .............................................................17, 31, 35

*In re AT&T Mobility Wireless Data Servs. Sales Tax Litig.*,
    792 F. Supp. 2d 1028 (N.D. Ill. 2011) ...............................................................57

*In re Cendant Corp. Litig.*
    264 F.3d 201 (3d Cir. 2001) ......................................................................37, 50

*In re Cendant Corp. Sec. Litig.*
    404 F.3d 173 (3d Cir. 2005) ..............................................................................39

*In re Cont'l Ill. Sec. Litig.*,
    962 F.2d 566 (7th Cir. 1992) ......................................................20, 41, 54, 60

*In re Enron Corp. Sec.*,
    586 F. Supp. 2d 732 (S.D. Tex. 2008)................................................19, 56, 57

*In re Sears Roebuck & Co. Sec. Litig.*,
    No. 02 C 7527, slip op. (N.D. Ill. Jan. 8, 2007)..........................................55, 56

*In re Synthroid Mktg. Litig.*
    264 F.3d 712 (7th Cir. 2001) ................................................................. *passim*

*In re Synthroid Mktg. Litig.*
    325 F.3d 974 (7th Cir. 2003) ................................................................. *passim*

*In re Tyco Int'l, Ltd.*,
    535 F. Supp. 2d 249 (D.N.H. 2007)..........................................................56, 57

*In re Veritas Software Corp. Sec. Litig.*,
    496 F.3d 962 (9th Cir. 2007) ....................................................................36, 37

*In re Waste Mgmt., Inc. Sec. Litig.*,
    No. 97 C 7709, 1999 U.S. Dist. LEXIS 16566
    (N.D. Ill. Oct. 18, 1999)......................................................................................55

**Page**

*In re WorldCom, Inc. Sec. Litig.*,
    388 F. Supp. 2d 319 (S.D.N.Y. 2005) ...............................................27

*Knisley v. Network Assocs., Inc.*,
    312 F.3d 1123 (9th Cir. 2002) ................................................22, 27, 28

*Kucana v. Holder*,
    ___ U.S. ___, 130 S. Ct. 827 (2010)..............................................40

*Kunz v. DeFelice*,
    538 F.3d 667 (7th Cir. 2008) ......................................................23, 29

*Lujan v. Defenders of Wildlife*,
    504 U.S. 555 (1992).......................................................................22, 27

*Manning v. United States*,
    546 F.3d 430 (7th Cir. 2008) .............................................................2

*McNutt v. Bd. of Trustees*,
    141 F.3d 706 (7th Cir. 1998) ...........................................................35

*Mercury Interactive Corp. Sec. Litig. v. Mercury Interactive Corp.*,
    618 F.3d 988 (9th Cir. 2010) ......................................................18, 19

*Metzler Inv. GMBH v. Corinthian Colls., Inc.*,
    540 F.3d 1049 (9th Cir. 2008) .........................................................44

*Miller v. Asensio & Co.*,
    364 F.3d 223 (4th Cir. 2004) .....................................................44, 45

*Missouri v. Jenkins*,
    491 U.S. 274 (1989).........................................................................60

*Oran v. Stafford*,
    226 F.3d 275 (3d Cir. 2000) .............................................................44

*Pole v. Randolph*,
    570 F.3d 922 (7th Cir. 2009) .....................................................29, 60

758145_1

**Page**

*River Rd. Hotel Partners, LLC v. Amalgamated Bank*,
651 F.3d 642 (7th Cir. 2011) .......................................................32, 33

*Robinson v. Shell Oil Co.*,
519 U.S. 337 (1997).......................................................................32, 33

*Russello v. United States*,
464 U.S. 16 (1983)..............................................................................34

*Skelton v. General Motors Corp.*,
860 F.2d 250 (7th Cir. 1988) .......................................................40, 59

*Synfuel Techs., Inc. v. DHL Express (USA), Inc.*,
463 F.3d 646 (7th Cir. 2006) ..............................................................36

*Taubenfeld v. Aon Corp.*,
415 F.3d 597 (7th Cir. 2005) ..................................................... *passim*

*United States v. Carpenter*,
143 F.2d 47 (7th Cir. 1944) .........................................................35, 39

*United States v. Dabney*,
498 F.3d 455 (7th Cir. 2007) .......................................................17, 39

*United States v. Doig*,
950 F.2d 411 (7th Cir. 1991) ..............................................................34

*United States v. Herrera*,
878 F.2d 997 (7th Cir. 1989) ................................................................2

*United States v. Kimberlin*,
898 F.2d 1262 (7th Cir. 1990) ............................................................52

**Page**

## STATUTES, RULES AND REGULATIONS

15 U.S.C.

§78a ................................................................................................32
§78j(b) .......................................................................................4, 43
§78t(a) ..............................................................................................4
§78u-4(a)(6) ..............................................................................24, 39
§78u-4(a)(7)(A) ................................................................................36
§78u-4(a)(7)(B) .......................................................................... *passim*

28 U.S.C.

§1291 ................................................................................................1

Federal Rules of Civil Procedure

Rule 23 ...........................................................................................11
Rule 23(h) ..................................................................................18, 39

17 C.F.R.

§240.10b-5 ..................................................................................4, 43

## SECONDARY AUTHORITIES

Lucian Arye Bebchuk, *The Questionable Case for Using Auctions to Select
   Lead Counsel*, 80 Wash. U. L.Q. 889 (2002) ....................................52

Susan Chandler, *Sears Restates Its 1st-Half Results, SEC Discovers
   Accounting Error; Profit Unchanged*, Chi. Trib., Oct. 3, 2002 ........................56

Brian T. Fitzpatrick, *An Empirical Study of Class Action Settlements and
   Their Fee Awards*, 7 Journal of Empirical Legal Studies 811 (2010) .........49, 57

Logan, *et al.*, *Attorney Fee Awards in Common Fund Class Actions*, Class
   Action Reports 167 (Vol. 24, No. 2, March-April 2003) ...................................59

*Manual for Complex Litigation* (4th ed. 2004)
   §14.211 ..........................................................................................41

**Page**

Denise N. Martin, *et al.*, *Recent Trends IV: What Explains Filings and Settlements in Shareholder Class Actions?* (NERA Nov. 1996)........................49

Dr. Jordan Milev, *et al.*, *Recent Trends in Securities Class Action Litigation: 2011 Mid-Year Review* (NERA July 2011) .......................................................49

Ronald I. Miller, Ph.D., *et al.*, *Recent Trends in Shareholder Class Action Litigation: Beyond the Mega-Settlements, is Stabilization Ahead?* (NERA Apr. 2006)...........................................................................................................43

Lisa van der Pool, *Lawyer inflation: With economy mending, many firms return to raising rates*, Boston Business Journal (April 27, 2012) ...................61

758145_1

## I.     JURISDICTIONAL STATEMENT

Pursuant to Circuit Rule 28(b), Plaintiffs-Appellees Macomb County Employees' Retirement System ("Macomb County") and St. Clair Shores Police & Fire Retirement System ("St. Clair") (together, "Plaintiffs") state that the jurisdictional summary in Objector-Appellant Liles's brief (No. 12-2339) is complete and correct.

The jurisdictional summary in Objector-Appellant Falkner's brief (No. 12-2354) is incomplete and incorrect, however, as it omits the final judgment entered on May 9, 2012.  *See* A-17.[1]  That final judgment provides this Court with jurisdiction pursuant to 28 U.S.C. §1291.

## II.     STANDARDS OF REVIEW

This Court's "standard of review in fees cases is a well-established abuse of discretion standard."  *Harman v. Lyphomed, Inc.*, 945 F.2d 969, 973 (7th Cir. 1991). It is a "'***highly deferential*** abuse of discretion standard,'" *Estate of Borst v. O'Brien*, 979 F.2d 511, 514 (7th Cir. 1992), for "'district courts are far better suited than appellate courts to assess a reasonable fee in light of the case's history.'" *Taubenfeld*

---

[1]     This Brief's citations to the record will be as follows: "A-__" denotes pages in Liles's "Brief Appendix."  "AA-__" denotes pages in Liles's "Additional Appendix."  And "R__" denotes record entries on the district court's Civil Docket that are not reproduced in either appendix.

*v. Aon Corp.*, 415 F.3d 597, 600 (7th Cir. 2005).[2]  Under the abuse-of-discretion

standard, an award is reversed "if it cannot be rationally supported by the record." *Id.*

This Court defers to the stated facts underlying the district court's decisions

unless they are clearly erroneous.  *Bill's Coal Co. v. Bd. of Public Utils.*, 887 F.2d

242, 244 (10th Cir. 1989).  A finding of fact is clearly erroneous "only if, after

reviewing the entire evidence, we are left 'with the definite and firm conviction that a

mistake has been committed.'" *United States v. Herrera*, 878 F.2d 997, 1000 (7th Cir.

1989).

The district court's interpretation of the Private Securities Litigation Reform

Act of 1995 ("PSLRA") is reviewed *de novo*.  *Manning v. United States*, 546 F.3d

430, 432 (7th Cir. 2008).

## III.   COUNTERSTATEMENT OF THE ISSUES

1.    Whether the district court correctly found that the Class Notice satisfied

the PSLRA's plain text by setting forth issues upon which the parties disagreed, as

well as the estimated damages suffered by class members.

2.    Whether the district court, with its extensive oversight of this matter and

firsthand knowledge of Class Counsel's efforts in securing the $200 million recovery,

---

[2]    ***Emphasis*** added and internal citations omitted unless otherwise noted.

acted within its discretion in holding that the fee awarded was fair and reasonable based upon market-rate considerations.

3.     Whether, given the lack of record evidence that he has even submitted a claim for payment from the settlement, Liles has standing to appeal Class Counsel's fee.

## IV.  COUNTERSTATEMENT OF THE CASE

### A.     Nature of the Case

The underlying matter was a securities-fraud class action initiated in 2007 by investors in Motorola, Inc. ("Motorola" or the "Company") securities against the Company and certain of its executives (together, "Defendants").     R456:¶18.[3] Additional actions against Defendants were brought, and consolidated with the underlying matter.  R456:¶¶19-21.  To spearhead the litigation on behalf of the plaintiff class following consolidation, the district court appointed institutional

---

[3]     "R456" is the Declaration of Tor Gronborg, one of the Class Counsel, filed in support of approval of the underlying settlement, plan of allocation, attorneys' fees and expenses, and Plaintiffs' expenses.   It contains, in one document, a comprehensive narrative detailing the procedural and substantive evolution of the action.

- 3 -

investor Macomb County as "lead plaintiff," and approved Macomb County's choice of Class Counsel.  R456:¶21.[4]

The underlying lawsuit involved allegations of violations of §§10(b) and 20(a) of the Securities Exchange Act of 1934, and Rule 10b-5 promulgated by the Securities and Exchange Commission ("SEC").  R456:¶7.  In a nutshell, Plaintiffs alleged that during a period spanning July 19, 2006 through January 4, 2007 ("Class Period"), Defendants participated in a fraudulent scheme to hide from investors both the known delays in Motorola's ability to timely deliver new "3G" mobile handsets to the market and one-time intellectual property arrangements used to conceal the financial repercussions of those delays.  *Id*.  The fraud allegedly inflated Motorola's stock price during the Class Period.  R456:¶8.  When the fraud was revealed, beginning in November 2006, Motorola's stock price declined significantly.  *Id*.

The lawsuit ultimately spanned nearly five years and over 470 docket entries. *See* R1-R475.  Following numerous mediation sessions overseen by a retired jurist (R456:¶¶106-108), the parties reached a $200 million cash settlement in December 2011 – just months before trial was to commence.  R456:¶108.  The settlement

---

[4]    "Class Counsel" comprised both "Lead Counsel" Robbins Geller Rudman & Dowd LLP, and Chicago-area "Liaison Counsel" Miller Law LLC.

represents the third-largest securities class action settlement ever reached in this Circuit.  R456:¶4.

After the settlement's preliminary approval in February 2012, a district court-approved class notice ("Class Notice") describing its terms was mailed to over 712,000 potential class members.  R464:1.  The Class Notice included the estimated per-share recovery expected from the settlement and Plan of Allocation (AA-68:§I & AA-72-AA-74:§XIII), and informed class members that, *inter alia*, Class Counsel would seek 27.5% of the settlement fund in fees.  AA-69:§IV.  Class members were directed to file objections, if any, by April 2, 2012.  AA-74:§XVIII.  Out of the hundreds of thousands of class members, only the two Objectors here filed objections.[5]  Although the class includes hundreds of institutional investors who collectively held over 75% of Motorola common stock during the Class Period, not one of them objected to the settlement or Class Counsel's fee request, and no class member has opted out of the settlement.  R464:2.

After considering briefing by both the Plaintiffs and Objectors, the district court overruled the latters' objections, approved the settlement, and awarded Class Counsel their contingent attorneys' fee out of the common fund.  *See* A-3 ("Notice Opinion")

---

[5]     A third objection was filed by non-class member Abraham Laniado.  A-3.  Mr. Laniado has not appealed.

and A-7 ("Fee Opinion").   The Objectors now seek to have those decisions overturned.

### B.    Course of Proceedings and Disposition Below

Purchasers of Motorola securities filed the first of several securities-fraud class actions against the Defendants on August 9, 2007.  R1.  The suits were consolidated on October 16, 2007, and the district court appointed Macomb County as the PSLRA-mandated "lead plaintiff" and approved its choice of Class Counsel.  R36.  After extensive investigation, on December 20, 2007, Macomb County filed a Consolidated Amended Complaint against the Defendants.  R40.

As described more fully *infra* in the "Counterstatement of Relevant Facts," the next four years involved a whirlwind of litigation.  The parties engaged in significant briefing, including motions for dismissal, summary judgment, class certification, and numerous thorny discovery issues.  Class Counsel reviewed over 3.8 million pages of documents, took or defended the depositions of 50 fact witnesses and seven expert witnesses, and prepared the case for trial.[6]  At various points in the litigation, the parties engaged in formal mediation efforts.  The first of five mediation sessions before Judge Daniel Weinstein (Ret.) took place in summer 2009; the final session

---

[6]     When class certification was granted in August 2009, St. Clair joined Macomb County as the court-approved "Plaintiffs" representing the class.  R140.

758145_1

was held in December 2011.  R456:¶¶106-108.  Following that session, the parties

agreed to the mediator's proposal to resolve the litigation and, on December 20, 2011,

informed the district court that they had reached a tentative settlement.  R456:¶108.

Plaintiffs moved for preliminary approval of the settlement in February 2012.

R445-R448.  Following a February 16, 2012 hearing, the district court preliminarily

approved the settlement, as well as the form and manner of notice to the absent class.

R450.   The Class Notice informed absent class members, *inter alia*, about the $200

million settlement, and that Class Counsel would seek a 27.5% fee.  AA-69:§IV; AA-

74:§XVI.  Class members were told of the May 9, 2012 final-approval hearing, and

potential objectors were informed that they could "appear and be heard" at the hearing

after timely submitting their objections.  AA-69:§IV; AA-74-AA-75:§XVIII.

Following that notice to some 712,000 potential class members, just two filed

objections: Messrs. Falkner and Liles.  Objector Falkner timely filed his objection

(R463); Liles filed his 28 days late.  R466.

Despite Liles's tardiness, the district court considered his objection and

overruled it.  A-3.  Falkner's written objection also received the court's scrutiny, and

was overruled in the separate Fee Opinion.  A-7.  The district court approved the

overall settlement (A-3), the settlement's plan of allocation (A-29), Class Counsel's

fees and expenses (with one exception) as well as the Plaintiffs' statutorily

reimbursable expenses (A-7), and entered a final judgment and dismissal with prejudice.  A-17.[7]

## V.     COUNTERSTATEMENT OF RELEVANT FACTS

### A.     A Brief Summary of the Underlying Litigation

The underlying action spanned nearly five years since its inception in August 2007.  The specific details of that hard-fought litigation, while too numerous to repeat within this Brief's confines, are recounted at length in a declaration filed by Class Counsel.  *See* R456.  They are also summarized in a March 19, 2012 memorandum that the Plaintiffs filed in support of final approval of the settlement, its plan of allocation, attorneys' fees and expenses, and reimbursement of plaintiffs' expenses. R455.

That memorandum explains that over the litigation's course, Class Counsel, *inter alia*: (1) conducted detailed investigative interviews of witnesses, including former Motorola employees; (2) successfully opposed Defendants' motion to dismiss; (3) successfully moved for class certification (including expert reports and certification-related discovery); (4) conducted extensive merits discovery, including procuring, reviewing, and analyzing approximately 3.8 million pages of documents

---

[7]     The court disallowed computer-research expenses.  A-15.

produced by Defendants and third parties; (5) deposed or defended the depositions of 50 fact witnesses and seven experts; (6) responded to discovery propounded by Defendants, including document requests, interrogatories, and requests for admission; (7) successfully litigated numerous complex discovery motions; (8) resolved Defendants' motions for summary judgment, which required extensive briefing and the submission of hundreds of exhibits to the court; (9) completed expert discovery, which included the preparation and review of expert reports involving seven testifying experts in the areas of accounting, the mobile handset industry, mobile technology, materiality, loss causation, and damages; (10) fully briefed seven *Daubert* motions; and (11) commenced extensive trial preparation, including exhibit and witness lists, designating videotaped depositions, preparing motions *in limine*, and jury instructions. R455:2-3.

All told, Class Counsel and their paraprofessionals expended over 38,000 hours in the matter's prosecution and resolution.  R455:3.

## B.    Settlement Negotiations

While the litigation described *supra* was ongoing, the parties engaged in formal settlement discussions over a two-and-a-half-year period. R456:¶¶106-108.  Pursuant to a June 2009 district court order directing them to "exhaust all settlement possibilities" (R99), the parties retained Judge Daniel Weinstein (Ret.), a nationally

- 9 -

recognized mediator with extensive experience in securities cases.   R456:¶106.
Beginning on February 11, 2010, the parties met with Judge Weinstein five times.
R456:¶¶106-108.   The parties also continued to communicate with each other
informally.  R456:¶¶106-107.  After the first four sessions had ended in August 2011,
no resolution was reached, and the parties intensified their trial-preparation efforts.
R456:¶107.

At the district court's direction, the parties again met with Judge Weinstein in
December 2011.  R456:¶108.  After that meeting, Judge Weinstein proposed the
parties settle the litigation for $200 million – which proposal the parties accepted on
December 19, 2011.  *Id*.  On December 20, 2011, the parties informed the district
court that a tentative settlement had been reached.  *Id*.

Over the next month-and-a-half, the parties continued to negotiate the
settlement's complex details, documenting it and preparing preliminary approval
papers.  R456:¶109.  On February 2, 2012, the parties presented a stipulation of
settlement and preliminary-approval papers to the district court.  R445-R448.

On February 16, 2012, the district court held a preliminary-approval hearing.
R456:¶109.  At that hearing, the court granted preliminary approval of the settlement
and approved the form and manner of notice to the class.  *Id.*; R450 ("Preliminary
Approval Order").  The Preliminary Approval Order expressly found that the Class

- 10 -

Notice met the requirements of both due process and Fed. R. Civ. P. 23, and that it was the best notice practicable under the circumstances. R450:¶3. The order also specified that Class Counsel's motion for attorneys' fees and expenses would be filed by March 19, 2012. R450:¶12.

### C.    The Court-Approved Class Notice Is Directed to Class Members

After an initial mailing to 604,117 potential class members (R462:¶4), the court-approved Class Notice of the settlement ultimately was sent to over 712,000 potential class members (R464:1), and published in *Investor's Business Daily* and over *PR Newswire*. R462:¶13. In addition, the settlement's claims administrator ("Gilardi") on February 27, 2012 established a toll-free number "to accommodate potential class member inquiries." R462:¶11.

That same day, Gilardi posted relevant settlement- and approval-related documents on its website, including copies of the Class Notice and the district court's Preliminary Approval Order. R462:¶12. As noted *supra*, that latter document told absent class members that Class Counsel would file its motion for attorneys' fees by March 19, 2012. R450:¶12.

In order to help class members evaluate the $200 million settlement, the Class Notice: (1) indicated that the average distribution per share was estimated to be $0.28 (assuming claims for 100% of the securities entitled to participate in the distribution

- 11 -

were submitted) (AA-68:§1); and (2) provided a detailed Plan of Allocation setting forth the maximum damages per share that the Plaintiffs believed "**could have been recovered** by Class Members **had Plaintiffs prevailed at trial**." AA-72:§XIII.

The Class Notice further indicated that the Plaintiffs and Defendants disagreed on the "average amount of damages per share, if any, that would have been recoverable if Plaintiffs were to have prevailed on each claim alleged." A-68:§II.[8] Thus, the Class Notice specified that:

> The issues on which the parties disagree are many, but include: (1) whether Defendants engaged in conduct that would give rise to any liability to the Class under the federal securities laws, or any other laws; (2) whether Defendants have valid defenses to any such claims of liability; (3) the appropriate economic model for determining the amount by which the prices of Motorola publicly traded securities were allegedly artificially inflated (if at all) during the Class Period; (4) the amount by which the prices of Motorola publicly traded securities were allegedly artificially inflated (if at all) during the Class Period; (5) the effect of various market forces on the prices of Motorola publicly traded securities at various times during the Class Period; (6) the extent to which external factors influenced the prices of Motorola publicly traded securities at various times during the Class Period; (7) the extent to which the various matters that Plaintiffs alleged were materially false or misleading influenced (if at all) the prices of Motorola publicly traded securities at various times during the Class Period; and (8) the extent to which the various allegedly adverse material facts that Plaintiffs alleged were

---

[8]    The PSLRA requires that, when "the parties do not agree on the average amount of damages per share that would be recoverable if the plaintiff prevailed on each claim alleged under this title, [the settlement notice must contain] *a statement from each settling party concerning the issue or issues on which the parties disagree*." 15 U.S.C. §78u-4(a)(7)(B)(ii).

omitted influenced (if at all) the prices of Motorola publicly traded securities at various times during the Class Period.

A-68:§II.

### D. Plaintiffs Move for Final Approval of the Settlement and Class Counsel's Fee

On March 19, 2012, Plaintiffs filed their motion for final approval of the settlement, plan of allocation, and Class Counsel's fee and expenses request, together with all supporting papers. R454-R462.

The supporting papers included declarations from the institutional-investor Plaintiffs. James Haddad, the Chairman of the Board of St. Clair, confirmed that since its August 25, 2009 appointment as an additional class representative, St. Clair had reviewed and monitored both the litigation's progress and Class Counsel's prosecution of the matter (R459:¶3(a)-(i)), and declared that St. Clair approved both the $200 million settlement and Class Counsel's request for a 27.5% attorneys' fee. R459:¶4. In considering that settlement, Mr. Haddad noted, St. Clair's Board of Directors had weighed its "substantial pecuniary benefits" against the "significant risks and uncertainties of the Litigation up to and through the scheduled April 2012 trial." R459:¶5. The Board considered those "same factors in considering and approving" the fee request; the approval was reached "in deliberation conducted independent of Lead Counsel." *Id.*

- 13 -

Macomb County echoed its fellow class representative's comments. Peter Provenzano, the Finance Director and Secretary of Macomb County's Retirement Commission, noted Macomb County's constant involvement in the litigation. R458:¶3. After the settlement-in-principle was reached, as part of "Macomb County's fiduciary duties to the Class, independent of Lead Counsel," it had considered the reasonableness of both the settlement and Class Counsel's requested fee. *Id*. Based upon that consideration, Macomb County concluded that both the settlement and Class Counsel's 27.5% fee were "fair, reasonable and adequate, and in the best interests of the Class." R458:¶4.

In addition to those declarations, the Plaintiffs submitted a 49-page report by Professor Charles Silver ("Silver Report"). AA-6-AA-54. Professor Silver holds an endowed chair in Civil Procedure at the University of Texas School of Law, and spent seven years as an Associate Reporter on the American Law Institute's Project on the Principles of Aggregate Litigation. AA-7-AA-8.[9] Having reviewed both market-based evidence and prior court-awarded fee awards, Professor Silver concluded that the requested 27.5% fee was reasonable. *See* AA-7; AA-54. He noted that although

---

[9] Many of Professor Silver's written works have appeared in peer-reviewed publications, and numerous state and federal judges have relied upon his testimony on the reasonableness of settlements and fee awards. *Id*. Legal treatises, including the *Manual for Complex Litigation (Third)* and the *Manual for Complex Litigation (Fourth)*, have cited his work many times. AA-9.

"[i]t is impossible to know precisely what fee percentage would have emerged from direct, *ex ante* negotiations," the available evidence suggested that a negotiated fee "would have equaled or exceeded the requested amount."  AA-7.

### E.     The District Court Approves the Settlement, Plan of Allocation, and Class Counsel's Fee, and Rejects the Appellants' Objections

In May 2012, the district court granted final approval to the settlement and its plan of allocation, approved Class Counsel's fee, and entered final judgment.  R468-R475.  As part of that final-approval process, the court considered – and rejected – Objectors' arguments.

### 1.     The District Court's Rejection of Liles's Objection

Objector Liles filed his untimely "Objections to the Purposed [*sic*] Settlement" on April 30, 2012 – 28 days after the April 2 due date.  AA-76.  Liles claimed that his tardiness was excusable because (a) as a Motorola stockholder in "Street Name," he had not received the Class Notice from his broker until April 6, 2012, and (b) the additional three-week delay in responding from *that* date "was due to [his] daughter's wedding."  AA-76-AA-77.  Despite the submission's untimeliness, the district court considered Liles's objection on the merits.

The court rejected Liles's contention that the "Statement of Potential Outcome of Case" in the Class Notice violated the PSLRA.  A-4.  Quoting the PSLRA, the

court noted that the statute requires *either* (1) a statement concerning the "'average amount of damages per share that would be recoverable'" if plaintiffs prevailed on each securities claim, *or* (2) a statement from the parties "'concerning the issue or issues on which the parties disagree.'" *Id*. (quoting 15 U.S.C. §§78u-4(A)(7)(B)(i)-(ii)).  Here, observed the court, the settling parties' "Statement of Potential Outcome of Case" explained that they could not agree on the damages amount, and that the issues on which the parties disagreed "are many, but include[d]" eight specific areas. A-4-A-5 (listing eight areas of disagreement); *see also supra* §V.C. (repeating Class Notice's "Statement of Potential Outcome").

Liles nonetheless objected that the Statement was "deficient" under the PSLRA "because it does not set forth the average amount of damages" that would have been recoverable had Plaintiffs prevailed.  A-5.

The district court rejected Liles's argument.  It found that the Class Notice properly "set forth the issues regarding damages on which the parties disagree."  A-5. Moreover, the Class Notice also provided "a detailed plan of allocation, which 'reflects an assessment of the damages that [Class Counsel] believe could have been recovered by Class Members had Plaintiffs prevailed at trial.'"  A-5 n.2 (citing §XIII of the Class Notice).

758145_1

Liles relied upon two out-of-Circuit cases, but the court found that they were "distinguishable" and did not address the issues he raised.  A-5.  A more-apposite holding, explained the district court, was a recent (unpublished) Second Circuit decision affirming a district court's rejection of an argument similar to Liles's; there, the Second Circuit held that the PSLRA's plain text "'clearly requires an amount recoverable be provided *only* in the case that the parties agree on that amount.'"  A-6 (quoting *In re Am. Int'l Grp.* ("*AIG*"), 452 F. App'x 75, 77 (2d Cir. 2012) (emphasis in original)).  The district court found *AIG* "persuasive," and added that the Class Notice here "was even more focused on particular areas of disagreement relating to damages" than the notice approved in *AIG*.  A-6.

### 2.  The District Court's Rejection of Falkner's Objection

Falkner's timely objection was twofold: First, he argued that Class Counsel had not given reasonable notice of the fee motion to class members.  R470:3.[10]  Second, Falkner argued that the Plaintiffs had failed to "'discharge their fiduciary duty' to negotiate an *ex ante* fee agreement" with Class Counsel.  R470:5.  The district court rejected both objections.

---

[10]     Falkner does not raise this objection in his Opening Brief ("Falkner's Bf."), and has thus waived the issue.  *United States v. Dabney*, 498 F.3d 455, 460 (7th Cir. 2007) ("Because the argument was not raised or developed in [appellant's] opening brief, it is waived.").

- 17 -

As to the first, the district court recounted the myriad ways in which Class Counsel had informed absent class members of their anticipated fee request. The Class Notice sent to class members on February 27, 2012 specified that Class Counsel were going to apply to the court for attorneys' fees of 27.5% of the settlement fund. A-10. That Class Notice told class members they could examine papers on the district court's docket "'for a more detailed statement of the matters involved in the litigation,' and could contact Class Counsel if they had questions about the settlement." *Id*. The Notice also informed class members that the deadline for their objections to the motion for attorneys' fees and expenses was due by April 2, 2012. *Id*. (citing AA-74:§XVIII). And, the district court's Preliminary Approval Order – available on the Claim Administrator's website – specified that Class Counsel's request for attorneys' fees was due by March 19, 2012, and repeated that any objections to that request were due on April 2. R470; *see also* R450:¶12 (all opening briefs and supporting documents in support of, *inter alia*, Class Counsel's fees "shall be filed and served by March 19, 2012").

Relying upon *Mercury Interactive Corp. Sec. Litig. v. Mercury Interactive Corp.*, 618 F.3d 988 (9th Cir. 2010), Falkner nonetheless contended that the Class Notice was inadequate under Fed. R. Civ. P. 23(h) because Class Counsel had not provided reasonable service of the actual motion to the absent class. A-10. The

district court rejected that contention, explaining that "*Mercury Interactive* is inapposite" – for the issue in *Mercury Interactive* was whether the court had erred in setting the objection deadline on a date ***before*** lead counsel had to file their fee motion.  A-10-A-11.  Here, in contrast, Class Counsel filed their motion "two weeks before the objection deadline."  A-11.  "Indeed, . . . Mr. Falkner himself timely objected to the motion."  *Id*.

Falkner's second objection "fare[d] no better."  *Id*.  Falkner relied upon *Taubenfeld* (415 F.3d 597) to argue that the Plaintiffs had a fiduciary duty to negotiate an *ex ante* fee agreement with Class Counsel.  The district court disagreed, explaining that "the *Taubenfeld* court did not hold, or even suggest, that lead plaintiffs must negotiate a fee agreement at the outset of the case."  A-11.  The PSLRA "similarly contains no such requirement."  *Id*.

The district court also rejected Falkner's suggestions that (a) it adopt the fee percentage negotiated in the *Enron* litigation as the "'market rate,'" or (b) that the court limit Class Counsel to a fee "'of no more than 15%.'"  *Id*.  "Instead, after evaluating the factors" this Court set forth in *In re Synthroid Mktg. Litig.* ("*Synthroid I*"), 264 F.3d 712 (7th Cir. 2001), the district court expressly found "that the request of 27.5% of the Settlement Amount is consistent with the market rate."  A-11-A-12.

758145_1

### 3. Considering This Court's *Synthroid I* Factors, the District Court Approves Class Counsel's Fee Award

The district court noted that in determining the reasonableness of a fee award in a common-fund case, "'courts must do their best to award counsel the market price for legal services,'" keeping in mind the "'risk of nonpayment and the normal rate of compensation in the market at the time.'" A-8 (quoting *Synthroid I*, 264 F.3d at 718). Relevant factors include the probability of success at the litigation's outset, the risk of nonpayment, the quality of counsel's performance, the amount of work necessary to resolve the litigation, and the stakes of the case. A-8. The overall object in awarding a reasonable fee "'is to give the lawyer what he would have gotten in the way of a fee in arms' length negotiation, had one been feasible.'" *Id*. (quoting *In re Cont'l Ill. Sec. Litig.*, 962 F.2d 566, 572 (7th Cir. 1992)). Applying these factors to the record facts, the district court concluded that Class Counsel's requested fee was justified.

Both the "risk of nonpayment" and the "stakes in this complex securities fraud case were significant." A-12. Class Counsel litigated the case "aggressively" for four-and-a-half years "on a fully contingent basis." *Id*. The $200 million settlement was the "third-largest settlement" in a securities-fraud class action in this Circuit. *Id*. And, despite successfully defeating Motorola's summary judgment motion, additional hurdles lay ahead: "Plaintiffs faced significant risks at trial in proving both loss

causation and damages." *Id*. That trial "undoubtedly" would have been lengthy, and involved numerous fact and expert witnesses. *Id*.

The district court complimented Class Counsel's skill, noting that the representation provided had been "significant, both in terms of quality and quantity." *Id*. The court went on to list the myriad tasks undertaken by Class Counsel over the years (A-12-A-13); this Brief lists them *supra* at §V.A. "Moreover," noted the court, "there were no government investigations or prosecutions related to the alleged fraud upon which Class Counsel" could rely. A-13. "Rather, they investigated the facts and developed their theory of liability from scratch." *Id*. The endeavor involved "significant time and expense." *Id*.

Yet another factor supporting the fee was the Plaintiffs' approval. *Id*. The two institutional-investor Plaintiffs, with "significant financial stakes" in the litigation, had assessed the attorneys' fee issue independently of Class Counsel and approved the fee request. *Id*. Both had been actively involved in the litigation and were thus "uniquely familiar with Class Counsel's work on the case." *Id*.

Professor Charles Silver, an expert on fee issues, also evaluated the fee request in light of myriad relevant factors – including risks faced by Class Counsel, quality of representation, and results obtained – and concluded that the fee was "reasonable and

758145_1

in line with privately-negotiated arrangements in similar cases." A-13-A-14 (citing "R. 457, Silver Rep., *passim*").

In light of "all of the relevant factors," the district court concluded that the 27.5% requested fee "is reasonable." A-14. It also found that no lodestar cross-check was necessary. *Id*. (citing *Florin v. Nationsbank, N.A.*, 34 F.3d 560, 565 (7th Cir. 1994) (discussing court's discretion to choose between a percentage method and lodestar method)).

## VI.    SUMMARY OF ARGUMENT

This Court should affirm the district court's discretionary fee award, as well as its straightforward interpretation of the PSLRA's plain text concerning both fees and class notices.

As a threshold matter, Objector Liles does not have standing to challenge Class Counsel's fee award on appeal, for he has no redressable injury. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992). The record contains no evidence that Liles has filed a claim form against the Settlement Fund, despite being challenged in the district court to make that showing. Without having made a viable claim against the Settlement Fund from which Class Counsel's fee is paid, Liles cannot show that winning his appeal and reducing that fee will increase his recovery. Thus, he lacks standing to challenge Class Counsel's fee on appeal. *See Knisley v. Network Assocs.,*

*Inc.*, 312 F.3d 1123, 1126-27 (9th Cir. 2002) (if modifying the fee award on appeal would not redress his injuries, an objector "would lack standing to proceed"); *cf. In re Synthroid Mktg. Litig.* ("*Synthroid II*"), 325 F.3d 974, 976 (7th Cir. 2003) (objectors had standing to challenge class counsel's fees because they stood "to receive more from the settlement fund if they win on this appeal than if they lose").

Even if Liles retains standing to challenge Class Counsel's fee award, he has waived that challenge by dint of his failure to seriously challenge the fee in the district court. The overall thrust of his district-court objection centered on the allegedly faulty Class Notice. AA-76-AA-86. Buried within that objection, in just two sentences lacking any legal analysis or authority, Liles asserted that Class Counsel's fee was "unreasonable" and "excessive" in light of the Class Notice and settlement size. AA-79:¶10. He included none of the arguments concerning Class Counsel's fee that he raises now, and thus has waived the issue. *Kunz v. DeFelice*, 538 F.3d 667, 681 (7th Cir. 2008) ("Failure adequately to present an issue to the district court waives the issue on appeal.").

Liles's remaining objection fails as well. He insists that the PSLRA required Plaintiffs here to include in the Class Notice's "Statement of Potential Outcome of Case" their estimate of recoverable damages per share. That is a gross misreading of the statute, for the PSLRA requires such an estimate only when the parties ***agree*** on

- 23 -

the amounts; when the parties *disagree*, the PSLRA requires that a class notice list the issues upon which they disagree.  *Compare* 15 U.S.C. §78u-4(a)(7)(B)(i) *with* 15 U.S.C. §78u-4(a)(7)(B)(ii).  The Class Notice here satisfied the PSLRA by informing class members that the parties disagreed on recoverable damages and then setting forth the several issues of contention.  *See* AA-68:§II; *see also infra* §V.C.  Liles's objection contradicts the PSLRA's plain text, and is unavailing under canons of statutory interpretation and relevant case law.  The district court's rejection of that objection should be affirmed.

Objector Falkner's sole objection, to Class Counsel's fee award, is also baseless.  He argues that the PSLRA required Plaintiffs to enter into an *ex ante* fee agreement with Class Counsel at the litigation's outset, but nowhere in the statute is that requirement stated (or even implied).  To the contrary, the PSLRA requires only that the fee ultimately awarded by the court be a "reasonable percentage" of the monies paid to the class.  15 U.S.C. §78u-4(a)(6).  Moreover, Falkner admits that his position would require enforcing an *ex ante* agreement even if it "creates a windfall" for Class Counsel (Falkner's Bf. at 17) – a fantastic notion that runs counter to settled fee-award jurisprudence, in which the district court has a duty to protect the absent class by awarding reasonable attorneys' fees.

- 24 -

Falkner's remaining arguments against the fee award are similarly baseless.  He insists that the district court had no business considering the "quality" and "quantity" of Class Counsel's representation in recreating a proper market rate (Falkner's Bf. at 9), and yet those factors are among the exact ones this Court set forth in *Synthroid I*, 264 F.3d at 721.  He challenges the district court's reliance upon the Silver Report in approving the fee award, but both that Report (and the district court) went through myriad factors that help reproduce a proper market rate fee award.  He argues that the district court erred by not surveying "auction"-based fees, but that method of recreating a market rate is one of just several available; the district court was within its discretion to utilize other methods.

The overall theme of Falkner's Opening Brief is that the percentage awarded should not have exceeded 15% as a matter of law.  Yet this Court rejects arbitrary limits on fee awards, holding there is no cap applicable even in so-called "megafund" settlements.  *Synthroid I*, 264 F.3d at 718.  Indeed, this Court has approved higher percentages in the appropriate circumstances, and the district court noted both that fact as well as higher percentages in numerous cases within this Circuit's jurisdiction.  A-11 n.2.  Falkner's cherry-picked cases awarding lower percentages are inapposite, with circumstances differing greatly from the litigation here.

Finally, Falkner implies that the district court abused its discretion in not doing a lodestar "cross-check," and complains that many of Class Counsel's hours were billed by (supposedly) junior attorneys whose rates should be capped at $200-$250/hour. Falkner's lodestar argument contradicts this Court's precedents. *See*, *e.g.*, *Florin*, 34 F.3d at 566 (repeating the "law of this circuit that in common fund cases, the decision whether to use a percentage method or a lodestar method remains in the discretion of the district court"). Falkner's complaint about "junior" attorneys is a new argument on appeal, and can be ignored for that reason alone; it is unsupported as well. He points to nothing in the record (or case law) confirming that rates in complex, high-stakes litigation should be capped at $200-$250/hour.

## VII.  ARGUMENT

### A.  Objector Liles Lacks Standing to Appeal Class Counsel's Fee; Alternatively, He Has Waived Any Fee Challenge

#### 1.  Liles Has No Redressable Injury

A threshold issue in this appeal concerns the standing of Objector Liles to even pursue his appeal as to the fee award.

To state a case or controversy under Article III, a plaintiff must establish standing. *Allen v. Wright*, 468 U.S. 737, 751 (1984). Article III standing requires, at an "irreducible constitutional minimum," satisfaction of three elements: (i) the litigant must have received an injury-in-fact; (ii) "a causal connection between the injury and

- 26 -

the conduct complained of," such that it can be fairly traced to the other party, and (iii) it must be "'likely,' as opposed to merely 'speculative,' that the injury will be 'redressed by a favorable decision.'" *Lujan*, 504 U.S. at 560-61.

It is that third requisite element of Article III standing that is missing for Objector Liles. There exists no record evidence that Liles submitted a claim form against the Settlement Fund. Without having made a viable claim against the Settlement Fund, Liles cannot show that winning his appeal, or reducing the fee award, will increase his recovery from the Fund. *See, e.g.*, *Knisley*, 312 F.3d at 1126-27 (if modifying the fee award on appeal would not redress his injuries, an objector "would lack standing to proceed"); *see also Feder v. Elec. Data Sys. Corp.*, 248 F. App'x 579, 580 (5th Cir. 2007) (no appellate standing to object to class-action settlement where appellant did not file, *inter alia*, proof of claim form); *In re WorldCom, Inc. Sec. Litig.*, 388 F. Supp. 2d 319, 340 (S.D.N.Y. 2005) (failure to file proof of claim form deprives objector of standing to object to attorneys' fee award despite evidence of class membership).

This Court touched upon the issue in *Synthroid II*, 325 F.3d 974, when it explained that the objectors there complaining of class counsel's fees ***did*** have standing precisely because they stood "to receive more from the settlement fund if they win on this appeal than if they lose." *Id*. at 976. Because the fee awarded to

- 27 -

class counsel came at the objectors' expense, that loss could be "redressable by a favorable judicial decision." *Id*.

Liles, in contrast to the *Synthroid II* objectors, has no redressable injury. He will not receive one penny from the Settlement Fund, regardless of whether or not his putative appeal is successful. Liles thus lacks standing to pursue that portion of his appeal concerning Class Counsel's fee. *Knisley*, 312 F.3d at 1127; *cf. Synthroid II*, 325 F.3d at 976.

### 2. Liles's Arguments Below Concerned the Class Notice, Thus Waiving Any Fee Appeal

Even if Liles had standing to pursue his appeal of the fee award, he did not seriously challenge the requested fee in the district court. In his untimely "Objections to the Purposed [*sic*] Settlement," Liles focused exclusively on the allegedly faulty Class Notice – arguing at length that the PSLRA's text somehow required Plaintiffs to state the average amount of damages per share that would be recoverable if the class prevailed on each alleged claim. AA-76-AA-86.

As an aside, Liles added two sentences, bereft of any legal analysis or authority, claiming that Class Counsel's requested fee was "unreasonable" and "excessive" in light of the purportedly faulty Class Notice and settlement size. AA-79:¶10. He did not include any of the arguments about Class Counsel's fee that he raises now.

- 28 -

That absence of any real argument means that Liles has waived any appeal of the district court's fee award. *Pole v. Randolph*, 570 F.3d 922, 937 (7th Cir. 2009) ("A party may not raise an issue for the first time on appeal."); *see also Domka v. Portage Cty.*, 523 F.3d 776, 783 n.11 (7th Cir. 2008) (where party raises a specific argument for the first time on appeal, it is waived even though the "'general issue'" was before the district court); *Kunz*, 538 F.3d at 681 ("Failure adequately to present an issue to the district court waives the issue on appeal.").[11]

### B.     Because the PSLRA's Plain Text Does Not Require the Parties to Provide Damage Estimates When They Cannot Agree Upon Them, Liles's Remaining Objection Fails

Under a section entitled "Statement of potential outcome of case," the PSLRA requires that when "the parties do not agree on the average amount of damages per share that would be recoverable if the plaintiff prevailed on each claim alleged under this title," the settlement notice must contain "a statement from each settling party concerning the issue or issues on which the parties disagree." 15 U.S.C. §78u-4(a)(7)(B)(ii).

---

[11]     Objector Falkner's attack on Class Counsel's fees overlaps with Liles's waived arguments. Because of that waiver, Plaintiffs will focus on Falkner's arguments, and acknowledge Liles's overlapping arguments where relevant.

In this case, the parties could not agree on damages if the Plaintiffs prevailed on every claim; hence, in a section bold-headed "**STATEMENT OF POTENTIAL OUTCOME**," the Class Notice informed class members of the numerous issues of contention between the two sides. *See* AA-68:§II; *see also supra* §V.C. (reproducing text of "Statement of Potential Outcome" in full). That Statement comported with the PSLRA's unambiguous directive to list the issues in contention.

Despite the plain text of 15 U.S.C. §78u-4(a)(7)(B)(ii), Liles insists that the PSLRA says something altogether different. He devotes the first half of his Opening Brief ("Liles's Bf.") to a contrary reading of the PSLRA's "Statement of Potential Outcome of Case," which he sums up thusly:

> Where the parties disagree on the average amount of damages per share recoverable if the plaintiff prevailed on each claim, the PSLRA requires **at a minimum** that the notice inform class members of the plaintiffs' estimate of the recoverable damages per share.

Liles's Bf. at 10 (citing 15 U.S.C. §§78u4(a)(7)(B)(i)-(iii); emphasis in original); *accord* Liles's Bf. at 10-25.

In Liles's view, because the Statement of Potential Outcome did not include the Plaintiffs' estimate of recoverable damages if they fully prevailed on all claims – which sum he asserts is $1.638 per share – that Notice "violated" the PSLRA. *Id*. at 10. The only remedy for that purported violation, Liles suggests, is to return to the

district court, have the district court "re-notice the class" with the supposedly missing information, and hold another fairness hearing.  *Id*. at 8.

Liles's argument is without merit, and has already been rejected by a sister circuit.  *See AIG*, 452 F. App'x at 77 (objectors' "interpretation of the statute contradicts the statute's plain language and finds no support in the precedent of this or any other circuit").  The *AIG* objectors – represented by the same attorney now representing Liles – made the same argument that Liles makes here: Despite the *AIG* parties' disagreement on damages, the objectors insisted that the class notice still had to contain a statement identifying the recoverable damages if plaintiffs prevailed on their claims.  The Second Circuit rejected that argument, noting

> The plain language of 15 U.S.C. §78u-4(a)(7)(B)(ii), on which the [objectors] rely, however, does not require that the parties provide their respective views about recoverable damages in the event they disagree about the amount recoverable.  Rather, the plain language of the PSLRA clearly requires an amount recoverable be provided ***only*** in the case that the parties agree on that amount. 15 U.S.C. §78u-4(a)(7)(B)(i).  Here, the parties disagreed about damages recoverable, making 15 U.S.C. § 78u-4(a)(7)(B)(ii) rather than (B)(i) applicable.

*AIG*, 452 F. App'x at 77 (emphasis in original).  Given those facts, the "Notice of Settlement complied with the PSLRA."  *Id*.

That same result should obtain here, for Liles's argument is belied by the application of several canons of statutory interpretation.

758145_1

The logical starting place is the PSLRA's plain text. *Robinson v. Shell Oil Co.*, 519 U.S. 337, 340 (1997) ("Our first step in interpreting a statute is to determine whether the language at issue has a plain and unambiguous meaning with regard to the particular dispute in the case."); *River Rd. Hotel Partners, LLC v. Amalgamated Bank*, 651 F.3d 642, 648-49 (7th Cir. 2011) (same). Here, the PSLRA requires a class notice to contain one of two alternative statements:

**(B) Statement of potential outcome of case.**

**(i) Agreement on amount of damages.**

If the settling parties agree on the average amount of damages per share that would be recoverable if the plaintiff prevailed on each claim alleged under this title [15 U.S.C. §§78a *et seq*.], a statement concerning the average amount of such potential damages per share.

**(ii) Disagreement on amount of damages.**

If the parties do not agree on the average amount of damages per share that would be recoverable if the plaintiff prevailed on each claim alleged under this title [15 U.S.C. §§78a *et seq*.], a statement from each settling party concerning the issue or issues on which the parties disagree.

15 U.S.C. §78u-4(a)(7)(B).

This language is crystal clear. On the one hand, "[i]f the settling parties ***agree*** on the average amount of damages per share" recoverable if the plaintiff prevailed on each securities claim, they are required to note that amount in the class notice. 15 U.S.C. §78u-4(a)(7)(B)(i). If, on the other hand, the settling parties ***do not agree*** on

damages, subsection (ii) applies, and no dollar amount needs to be stated; there need be included only a statement of the "issue or issues" upon which the parties disagree. 15 U.S.C. §78u-4(a)(7)(B)(ii).  The Class Notice here did exactly that.  *See* AA-68:§II.

Liles's view that "the PSLRA requires publication of the Plaintiffs' position on the average amount of damages recoverable per share" had they prevailed (Liles's Bf. at 10) is thus contradicted by the PSLRA's unambiguous text, and this Court need not pursue further inquiry.  *Robinson*, 519 U.S. at 340 ("Our inquiry must cease if the statutory language is unambiguous and 'the statutory scheme is coherent and consistent.'").  Should the Court continue its inquiry, however, additional statutory-construction guides establish that Liles's interpretation of the PSLRA is wrong.

It is axiomatic that statutory language cannot be read so as to render a part, or parts, superfluous.  *Duncan v. Walker*, 533 U.S. 167, 174 (2001) ("'It is our duty "to give effect, if possible, to every clause and word of a statute."'"); *River Road*, 651 F.3d at 651 (an interpretation that renders any clause, sentence, or word superfluous "violates a cardinal rule of statutory construction").  And yet that is precisely what Liles's reading of the PSLRA does.  His requirement that the lead plaintiffs in settled securities class actions must always, "at a minimum," put forth their ***own*** estimation of per-share damages had they prevailed on all claims, ignores the disjunctive nature

of subsections (i) and (ii) that Congress took pains to separate. Both subsections describe wholly different statements that might be included in the notice, depending upon the circumstances; both subsections begin with the qualifier "if," followed by two very different scenarios depending upon the parties' agreement or disagreement.

Yet another canon of statutory interpretation torpedoes Liles's view of the statute. When Congress includes particular language in one section of a statute but omits it in another section of the same statute, "'it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion.'" *Russello v. United States*, 464 U.S. 16, 23 (1983); *see also United States v. Doig*, 950 F.2d 411, 414-15 (7th Cir. 1991) (noting Congress's careful placement of the term "'any person'" in one section of OSHA, versus "'any employer'" in another).

The relevant subsections of 15 U.S.C. §78u-4(a)(7)(B) each contain precise terms not included in the other. Subsection (i) specifies "***[i]f the settling parties agree***." 15 U.S.C. §78u-4(a)(7)(B)(i). In contrast, subsection (ii) specifies "***[i]f the parties do not agree***." 15 U.S.C. §78u-4(a)(7)(B)(ii). Moreover, subsection (i)'s requirement of "a statement concerning the average amount of such potential damages per share" is nowhere to be found in subsection (ii). The fact that Congress included the damages-estimate option in subsection (i) – making it contingent upon the parties' agreement – but omitted it in subsection (ii) – making that omission contingent upon

- 34 -

the parties' disagreement – demonstrates that Congress intended the two avenues as alternatives. *McNutt v. Bd. of Trustees*, 141 F.3d 706, 709 (7th Cir. 1998) ("The omission of a similarly specific reference in the very next statutory section therefore assumes special significance."). Liles's insistence that, despite the parties' disagreement, Plaintiffs nonetheless must include their ***own*** damages estimation runs roughshod over that Congressional intent.[12]

Liles also finds no solace in the case law. As noted *supra*, another circuit has already considered and rejected his same argument. *See AIG*, 452 F. App'x at 77. And Liles is unable to point to a single PSLRA notice decision in which a court required parties who disagreed on damages to nonetheless provide their individual per-share damages estimates.

What he does point to, however, are several inapposite decisions.

---

[12]     Liles attempts to resurrect his argument by pointing out that subsection (iii) refers to the inadmissibility in other actions and proceedings of statements under subsections (i) and (ii) that concern the "amount of damages." Liles's Bf. at 25. He asserts that it is "inconceivable" that Congress would make that reference in subsection (iii) "if a statement concerning the average amount of damages per share was not required pursuant to subsection (ii)." *Id*. Read *in pari materia*, Liles says, the three subsections require the result he urges. *Id*.; *see also id*. at 18. Liles is mistaken. Subsection (iii), read with the other two subsections, simply establishes that ***whatever*** type of statement regarding damages is made – whether a damages-per-share amount under (i) or the issue or issues on which the parties disagree under (ii) – that statement will not be admissible in other actions. Subsection (iii) certainly cannot be used to shoehorn the precise term "a ***statement concerning . . . potential damages***" into subsection (ii), which Congress kept free of that phrase. *United States v. Carpenter*, 143 F.2d 47, 48 (7th Cir. 1944) (in construing statute, court "cannot rewrite it, nor ignore the language which is clear").

- 35 -

For instance, he relies upon this Court's decision in *Synfuel Techs., Inc. v. DHL Express (USA), Inc.*, 463 F.3d 646 (7th Cir. 2006), and asserts that providing class members with a maximum damage calculation is "consistent" with this Court's policies. Liles's Bf. at 11; *see also id.* at 22-23. But *Synfuel* was not a securities action, and thus had no occasion to consider the PSLRA's class notice provisions. Rather, the *Synfuel* panel evaluated whether a settlement was "'fair, reasonable, and adequate,'" not whether the notice sufficiently apprised investors of the per-share damages recoverable had liability been established. 463 F.3d at 652.

Liles also relies upon a Ninth Circuit decision in which an inadequate class notice prompted that court to vacate and remand in part. *See In re Veritas Software Corp. Sec. Litig.*, 496 F.3d 962 (9th Cir. 2007). The district court here held that Liles's reliance on *Veritas* was "misplaced" (A-5), however, and that conclusion remains valid on appeal.

In *Veritas*, the Ninth Circuit was not opining upon the PSLRA subsection at issue here – 15 U.S.C. §78u-4(a)(7)(***B***); rather, the subsection at issue in *Veritas* was 15 U.S.C. §78u-4(a)(7)(***A***), the "Statement of plaintiff recovery." *See Veritas*, 496 F.3d at 971; *see also* A-5 ("The Ninth Circuit did not address the 'Statement of Potential Outcome of Case . . . .'"). The *Veritas* court evaluated the claims-rate assumptions underlying the plaintiffs' estimated per-share distribution from a

- 36 -

settlement. 496 F.3d at 971. Neither Liles nor any other class member, however, challenges the $0.28 per-share distribution estimate included in the "Statement of Plaintiff Recovery" portion of the Class Notice here. *Veritas* dealt with a different issue under a different PSLRA subsection, and is not instructive here.

The *Cendant* case, out of the Third Circuit, is no help to Liles. *See In re Cendant Corp. Litig.* ("*Cendant I*"), 264 F.3d 201 (3d Cir. 2001). That court was evaluating, *inter alia*, whether disagreeing parties proceeding under 15 U.S.C. §78u-4(a)(7)(B)(ii) were required to identify "every" issue they disagreed on – or just the "damages" issues. *Cendant I*, 264 F.3d at 247 n.26. Looking to the statute's plain text, the Third Circuit held that the parties were only required to identify the damages issues. *Id*. Indeed, *Cendant I* actually undermines Liles's position here, for the parties did exactly what the statute mandates under subsection (ii), without also providing the damages estimate that Liles insists is required. *Id*.

Finally, the Notice provides the very information that Liles claims is missing. In addition to identifying the average settlement distribution per share before fees and expenses, the Class Notice includes a Plan of Allocation setting forth the maximum damages per share that Plaintiffs believe "could have been recovered by Class Members had Plaintiffs prevailed at trial." AA-72:§XIII. That Plan allows all class members to compare the proposed settlement with what their recoverable damages

- 37 -

would have been, had Plaintiffs prevailed on each claim alleged. AA-72-AA-74:§XIII. For example, the Notice provides that maximum recoverable damages for a class member who bought Motorola common stock during the Class Period and sold that stock between July 7, 2006 and January 4, 2007 are "the lesser of (i) $1.07 (November 7, 2006 Price Decline); or (ii) the difference between the purchase price and the sales price." AA-72:§XIII(A)(1)(b). This is the comparative information that Liles argues is missing from the Notice.[13]

In sum, the district court's commonsense interpretation of the PSLRA is supported by the statute's plain language and case law. Liles's contradictory interpretation warrants no credence and, even if it did, the Class Notice provides the very information that he claims is missing.

### C.    The District Court Did Not Abuse Its Discretion in Awarding Class Counsel their Attorneys' Fee in Accordance with the *Synthroid I* Factors

Falkner has abandoned his claim that the Class Notice was deficient, and fills his brief with a scattershot compilation of reasons he says justify overturning the

---

[13]     On numerous occasions, Liles argues that the Class Notice should have stated that the damages recoverable if Plaintiffs prevailed at trial would be $1.638 per share. *See* Liles's Bf. at 2, 10, 13, 16, 19. Maximum recoverable damages, however, are a function of **when** class members bought or sold their Motorola securities. Accordingly, the Notice identified the damages that could have been recovered by a class member, had Plaintiffs prevailed on all claims at trial, based upon the timing of their purchase and sale of Motorola securities. AA-72-AA-74:§XIII.

discretionary fee award.[14]   As explained below, each of those reasons is wrong –
factually or legally, or sometimes both – and the district court's decision should be
affirmed.

> **1.    The PSLRA Does Not Require an *Ex Ante* Agreement,
> and Falkner Ignores the District Court's Inherent
> Duty to Determine a Fee's Reasonableness**

Falkner's insistence that the PSLRA *requires* an *ex ante* agreement between
lead plaintiffs and class counsel (Falkner's Bf. at 5) finds no support in the statute.[15]
Indeed, the PSLRA is silent on the subject of fee agreements between class counsel
and court-appointed Plaintiffs; it says only that the fee awarded "by the court" must be
a "reasonable percentage" of the monies paid to the class.  15 U.S.C. §78u-4(a)(6).[16]

That textual clarity must be respected, and Falkner's insertion of "*ex ante*
agreements*" rejected.  *Carpenter*, 143 F.2d at 48 (in construing statute, courts "cannot
rewrite it, nor ignore the language which is clear").  Had Congress wanted to require

---

[14]    Falkner has jettisoned his objection concerning the Class Notice's reasonableness under Fed. R. Civ. P. 23(h).  *See* R463:1.  "Because the argument was not raised or developed in [his] opening brief, it is waived."  *Dabney*, 498 F.3d at 460.  Moreover, the Counterstatement of Facts rebuts the argument, explaining that class members were told how and where they could view Class Counsel's fee motion prior to the objection deadline.

[15]    *See also* Liles's Bf. at 25-27.

[16]    With that text, holds the Third Circuit, "the PSLRA has made percentage-of-recovery the standard for determining whether attorneys' fees are reasonable."  *In re Cendant Corp. Sec. Litig.* ("*Cendant II*"), 404 F.3d 173, 188 n.7 (3d Cir. 2005).

- 39 -

the *ex ante* agreements that Falkner says, it "could easily have said so." *Kucana v. Holder*, ___ U.S. ___, 130 S. Ct. 827, 837 (2010); *Bass v. Stolper, Koritzinsky, Brewster & Neider, S.C.*, 111 F.3d 1322, 1326 (7th Cir. 1997) ("we are prohibited from reading into clear statutory language a restriction that Congress itself did not include").

The folly of Falkner's *ex ante*-only rigidity is demonstrated by his assertion that an "*ex ante* bargain **should be enforced** whether it works a hardship on class counsel **or creates a windfall for them**." Falkner's Bf. at 17. In Falkner's eyes, even an *ex ante* agreement that ultimately provides a generous "windfall" at the class's expense should nonetheless be enforced, for it represents what the two parties bargained for at arms' length.

That is a fantastic assertion. It elevates an unsupervised agreement between class representatives and their chosen attorneys over any judicial scrutiny into the fee's reasonableness. Such a notion runs counter to settled fee-approval jurisprudence – whether in fee-shifting situations, or in a common fund as here. *See, e.g.*, *Hensley v. Eckerhart*, 461 U.S. 424, 433 (1983) ("It remains for the district court to determine what fee is 'reasonable.'"); *Skelton v. General Motors Corp.*, 860 F.2d 250, 253 (7th Cir. 1988) (in common-fund situations, the "court becomes the fiduciary for the fund's beneficiaries and must carefully monitor disbursement to the attorneys by scrutinizing

- 40 -

the fee applications"); *see also Manual for Complex Litigation* §14.211 (4th ed. 2004) ("Judges have an independent duty to review fees and specifically determine if they are reasonable, applying traditional legal tests.").

### 2. The District Court Conducted a Proper Market-Rate Inquiry Under this Court's Precedents

This Court has long held that "when deciding on appropriate fee levels in common-fund cases, courts must do their best to award counsel the market price for legal services, in light of the risk of nonpayment and the normal rate of compensation in the market at the time." *Synthroid I*, 264 F.3d at 718; *see also Continental Illinois*, 962 F.2d at 568 ("the function of judges in fee litigation . . . is to determine what the lawyer would receive if he were selling his services in the market rather than being paid by court order").

A court makes this determination "by approximating the terms that would have been agreed to" by the parties "*ex ante*, had negotiations occurred." *Synthroid I*, 264 F.3d at 719. "Although is it impossible to know *ex post* exactly what terms would have resulted from arm's-length bargaining *ex ante*, courts must do their best to recreate the market." *Taubenfeld*, 415 F.3d at 599. They "consider[] factors such as actual fee contracts that were privately negotiated for similar litigation, information from other cases, and data from class-counsel auctions." *Id.* (citing *Synthroid I*, 264 F.3d at 719). *Synthroid I*, in turn, noted that setting the market rate for legal fees

- 41 -

depends in part on the ***risk of nonpayment*** a firm agrees to bear, in part on the ***quality of its performance***, in part on the ***amount of work necessary*** to resolve the litigation, and in part on the ***stakes of the case***.

264 F.3d at 721.

The district court here accomplished the foregoing market recreation, noting that it had "evaluat[ed] the factors" from *Synthroid I* and expressly found that "the request of 27.5% of the Settlement Amount is consistent with the market rate." A-11- A-12. In support of that ultimate finding – which warrants deference, unless clearly erroneous without any record support – the district court noted record facts corresponding to the *Synthroid I* factors:

**The risk of nonpayment.** (*See Synthroid I*, 264 F.3d at 718, 721.) "The risk of nonpayment" in this securities action had been "significant," found the court. A-12. The private matter did not follow an SEC or Department of Justice investigation "related to the alleged fraud upon which Class Counsel could rest their theory of the case." A-13. Class Counsel "developed their theory of liability from scratch." *Id*. The record also shows that Defendants never admitted fault; indeed, at each major stage of the litigation – motion to dismiss, class certification, and two motions for summary judgment – Defendants strenuously denied the allegations against them. R456:¶100.

The district court found that Class Counsel ultimately litigated the case "aggressively for four-and-one-half years, on a fully contingent basis." A-12. The hard-fought litigation resulted in "significant time and expense" (A-13) that Class Counsel had no assurance of recovering. The record shows that Class Counsel risked over 38,000 hours and millions of dollars litigating the case nearly to trial – a lodestar of some $17.2 million. R455:27. Litigation expenses advanced by Class Counsel totaled nearly $5 million. *Id*.

That time and those millions were always at risk. Private securities-fraud actions are notoriously difficult for plaintiffs to litigate successfully. According to a 2006 study by NERA Economic Consulting ("NERA"), by that year securities-fraud dismissal rates had ***doubled*** since the PSLRA's 1995 passage, accounting for 40.3% of dispositions.[17] Coming into this litigation, the Plaintiffs risked being unable to: (1) plead falsity with particularity; (2) plead a strong inference of Defendants' scienter; (3) sufficiently show that Defendants' misstatements were material; and (4) demonstrate loss causation. Each of these hurdles are required elements of securities-fraud actions brought under §10(b) and SEC Rule 10b-5, and the federal reporters are

---

[17]    *See* Ronald I. Miller, Ph.D., *et al.*, *Recent Trends in Shareholder Class Action Litigation: Beyond the Mega-Settlements, is Stabilization Ahead?* (NERA Apr. 2006), http://www.nera.com/67_5112.htm.

chock full of decisions dismissing cases for a failure to adequately plead (or prove) any one of them.  *See, e.g.*, *Metzler Inv. GMBH v. Corinthian Colls., Inc.*, 540 F.3d 1049 (9th Cir. 2008) (affirming dismissal for failure to plead loss causation, scienter, and falsity); *Oran v. Stafford*, 226 F.3d 275, 285 (3d Cir. 2000) (defendants' alleged misstatements immaterial as a matter of law); *Miller v. Asensio & Co.*, 364 F.3d 223, 235 (4th Cir. 2004) (upholding jury verdict finding no provable damages).

**The stakes of the case.**  (*See Synthroid I*, 264 F.3d at 721.)  The district court found that "the stakes of this complex securities fraud case were significant."  A-12. As ultimately demonstrated by the evidence uncovered by Class Counsel, this was a complex fraud with implications for all of Motorola's Class Period investors.  At stake was approximately $1 billion in alleged damages, and critical issues regarding the materiality of Defendants' misstatements and their scienter.  Even if the Plaintiffs prevailed on these issues, the class still  "faced significant risks at trial in proving both loss causation and damages."  A-12.  Any trial "undoubtedly would have been lengthy and would have involved numerous witnesses, both fact and expert."  *Id*.

This finding is supported by record facts showing the voluminous documentary discovery, the scores of depositions taken and defended, and the hotly litigated expert testimony from both sides.  The stakes only increased as the litigation headed towards trial following thousands of attorney hours and millions of dollars of lodestar and

- 44 -

expenses. Given that securities-fraud plaintiffs must prevail on every element of their claims, verdicts for defendants in these cases are not uncommon. *See* R455:28 n.9 (collecting adverse decisions). Loss causation and damages are particularly attractive targets for defendants. *See, e.g.*, *Hubbard v. BankAtlantic Bancorp, Inc.*, No. 11-12410, 2012 U.S. App. LEXIS 15134, at *31 (11th Cir. July 23, 2012) (affirming judgment as a matter of law in defendants' favor: Plaintiff "did not introduce evidence sufficient to support a finding in its favor on the element of loss causation"); *Miller*, 364 F.3d at 235 (upholding no-damages verdict).

**The quality of counsel's performance.** (*See Synthroid I*, 264 F.3d at 721.) The district court found that the "representation that Class Counsel provided to the class was ***significant***," specifically noting its "***quality***." A-12; *see also id*. (Class Counsel's "aggressive[ness]" noted). The district court then listed, in summary form, the myriad successful tasks undertaken by Class Counsel as they shepherded the case to a near-record recovery for the class. *See* A-12-A-13.

Professor Silver echoed the district court's comments, pointing out Class Counsel's "unusually heavy workload" and noting that they had prevailed on heavily contested motions beyond the usual motion to dismiss, and had successfully expanded the lawsuit's scope "after digging up evidence of accounting fraud." AA-22. With statistics showing 92% of all class actions dismissed or otherwise resolved before

- 45 -

reaching the summary-judgment stage, Class Counsel managed to not only take this lawsuit into the rarified 8%, but to prevail on Motorola's motion for summary judgment. *Id.*[18]

Unlike in some other securities-fraud actions, noted the court, there were no governmental investigations or prosecutions relating to Motorola's fraud that might have provided Class Counsel with a litigation roadmap: "Rather, they investigated the facts and ***developed their theory of liability from scratch***, involving significant time and expense." A-13; *see also* AA-24 ("Federal regulators missed Motorola's alleged misconduct entirely. [Class Counsel] gets sole credit for discovering the fraud, developing the evidence," and moving toward trial while "negotiating an outstanding settlement.").

**The amount of work necessary to resolve the litigation.** (*See Synthroid I*, 264 F.3d at 721.) Along with the "quality" of Class Counsel's representation, addressed *supra*, the district court also found that the "quantity" of work provided had been "significant." A-12. "The parties engaged in four and one-half years of complex litigation and formal settlement negotiations." *Id.* The court then set forth an

---

[18]    Professor Silver also noted the reputational excellence enjoyed by Lead Counsel Robbins Geller Rudman & Dowd LLP. The firm "is one of the premier securities class action law firms in the United States," he stated, "handl[ing] more securities class actions than other law firms, year after year." AA-21 (citing a 2011 Cornerstone Research study).

abbreviated summary of the litigation, recounting the extensive efforts leading to the class's recovery.  A-12-A-13.

**Information from "large common-pool cases."**  (*See Synthroid I*, 264 F.3d at 719).  In *Taubenfeld*, this Court explained that "data on fees awarded in other class actions in the jurisdiction," combined with the quality of representation, comprised "the same type of evidence ***needed to mimic the market*** per *Synthroid I*."  *Taubenfeld*, 415 F.3d at 600.  The Court noted approvingly lead counsel's submission of a table of 13 cases from the Northern District of Illinois where class counsel had been "awarded fees amounting to ***30-39%*** of the settlement fund."  *Id*.  Those data, held this Court, were "indicative of a rational relationship between the record in this similar case and the fees awarded."  *Id*.

The district court here utilized much of the same type of information as part of its overall fee-award analysis, noting (i) this Court's approval of a 30% fee in the *Taubenfeld* matter, (ii) the 30%-39% fee awards "correctly considered" by the lower court there, and (iii) the fact that Class Counsel had pointed to several securities fraud class actions in the same district "in which courts have awarded more than 30% of the settlement fund."  A-11 n.2.  Further, the district court cited the report submitted by Professor Silver who, as part of his analysis of the fee's reasonableness, had surveyed "contingent fees awarded in similar litigation."  A-13.  Professor Silver ultimately

- 47 -

concluded, said the district court, that the fee request here was reasonable "and in line with privately-negotiated arrangements in similar cases." A-13-A-14.[19] That analysis comports with this Court's direction to consider data from large common-pool cases.

It also comports with several fee decisions from this Court, and from district courts within this Circuit. For example, in *Cook*, this Court noted a special master's finding that contingent-fee agreements in the Chicago area typically range from 25%-30% of the amount recovered. *Cook v. Niedert*, 142 F.3d 1004, 1010 (7th Cir. 1998). In *Taubenfeld*, the Court noted approvingly a lower court submission showing class action fees in the Northern District of Illinois ranged from 30%-39%. 415 F.3d at 600. (A similar fee table is in this record at R455:32.) That compilation of fees, along with the quality of services rendered, comprised "the same type of evidence needed to mimic the market per *Synthroid I*." *Taubenfeld*, 415 F.3d at 600. And, in *Synthroid*

---

[19] While too voluminous to repeat here, several observations in the Silver Report are worth summarizing: (1) In "mass actions" (such as asbestos lawsuits and defective-product litigation), negotiated contingent fees "of 33%-40% are common . . . and . . . higher fees often prevail." AA-33. (2) In "conventional" plaintiff representations, the median fee ratio for those who agreed to a fixed fee was 33%. AA-36. (3) In cases in which contingent fees have been agreed to by sophisticated business clients, the marginal percentages "tend to be high." AA-39. Silver cites a 33% contingency fee in a dispute between NTP Inc. and the Blackberry's manufacturer Research in Motion Ltd. AA-39-AA-40. He notes that another professor reviewed 42 contingent-fee agreements in patent cases and concluded that (when using a flat fee) the mean rate was 38.6% of recovery; an alternative "graduated" fee rate ranged from 28% (upon filing) up to 40.2% through appeal. AA-40-AA-41. Liles attempts to belittle these data (Liles's Bf. at 29-33), but they show what rates the market is willing to bear in risky, complex litigation.

*II*, the Court remarked that it was doubtful that the market rate for attorneys representing one subclass of plaintiffs would have been only 15%, given that another subclass "had to offer 22% to sign up lawyers on contingent fee" – even though "a good deal of the risk had been dissipated" by that time.  325 F.3d at 978.

Academic studies support the fee, too.  A recent survey of securities class action settlements from 1996 through 2011 found that median attorneys' fees in cases settling for between $25 and $100 million was 27.3%, and the median fees for cases settling between $100 and $500 million was 22.2%.  *See* Dr. Jordan Milev, *et al.*, *Recent Trends in Securities Class Action Litigation: 2011 Mid-Year Review*, at 27 (NERA July 2011).  An earlier survey examined 433 settlements and concluded that "[r]egardless of case size, fees average approximately 32 percent of the settlement." Denise N. Martin, *et al.*, *Recent Trends IV: What Explains Filings and Settlements in Shareholder Class Actions?* at 12-13 (NERA Nov. 1996).  Notably, in that report, NERA included 18 settlements hailing from the Seventh Circuit; the attorneys' fees in those cases averaged 31.8%.  *See id*. at Table 12b.  A decade later, Seventh Circuit percentages remained almost as high.  *See* Brian T. Fitzpatrick, *An Empirical Study of Class Action Settlements and Their Fee Awards*, 7 Journal of Empirical Legal Studies 811, 836 (2010) (securities class action fee awards in this Circuit from 2006-2007, on

mean and median basis, were 27.4% and 29.0% respectively). All of these studies were part of the record. R455:32-33.

**The Plaintiffs' approval of the fee request.** The court noted that both Plaintiffs had "assessed the issue of attorney's fees independently of Class Counsel," and approved of the percentage sought. A-13. While that independent assessment and approval was not an *ex ante* "fee contract" between the court-appointed Plaintiffs and Class Counsel, the sworn declarations by the former, attesting to their continual oversight of the litigation and appreciation of the action's "significant risks and uncertainties" in approving the fee (R458:¶4; R459:¶5), is evidence that the fees are in line with the market rate for a case of this complexity and risk. *Cf. Cendant I*, 264 F.3d at 282 (suggesting that a "lead plaintiff is in the best position, under the PSLRA's scheme, to determine (at least initially) what its lead counsel's fee should be").

Despite the foregoing factors supporting the market-rate fee awarded, Falkner misstates Circuit law and attacks the district court's analysis. He argues that the "quality" and "quantity" of Class Counsel's representation are "unrelated to a market rate analysis" in this Circuit. Falkner's Bf. at 9.[20] Falkner's argument is flatly

---

[20] *See also* Liles's Bf. at 29-31.

contradicted by *Synthroid I.  See*  264 F.3d at 721 ("market rate . . . depends in part . . . on the quality of [counsel's] performance" and "in part on the amount of work necessary").   Falkner criticizes the district court's reliance on the Silver Report because the court did not extensively cite it, chapter and verse, in approving the fee. Falkner's Bf. at 12-13.[21]  Yet the Silver Report is prominently in the record, and the district court obviously considered it; the court was not obligated to repeat entire sections just to satisfy Falkner.  *Cf. Taubenfeld*, 415 F.3d at 600 (court's discretionary decision upheld when "rationally supported by the record").

Falkner also chides the district court for not comparing the percentage here to "auction" data from other cases, implying that such a comparison is required as a matter of law.[22]   But neither this Court, nor any other, mandates auction-fee comparisons in every case; rather, the comparison is one of several available "guides" in fee-award analyses.  *Synthroid I*, 264 F.3d at 719; *see also Taubenfeld*, 415 F.3d at 599 ("courts must do their best to recreate the market by considering factors ***such as*** actual fee contracts . . . information from other cases, and data from class-counsel auctions").  Indeed, this Court, post-*Synthroid I*, rejected a district court's arbitrary

---

[21]     *See also* Liles's Bf. at 31-32.

[22]     *See also* Liles's Bf. at 33, 35.

758145_1

15% cap that had been "derived . . . from the average bid by plaintiffs' law firms in the handful of securities class actions" in which auctions occurred. *Synthroid II*, 325 F.3d at 977. Instead of hewing to the "auction" percentage chosen by the district court, this Court looked to the 22% already agreed to by one subclass of plaintiffs in the case. *Id*. at 978. It then used that 22% as a "benchmark" to fashion an appropriate market-rate award for another subclass's attorneys. *Id*. at 980.[23] Falkner's myopic insistence on a class-action auction comparison fails.

Beyond his mistakes of law concerning a reasonable market rate, Falkner also lobs brickbats at the institutional-investor Plaintiffs, accusing them of "acquiesc[ing]" to Class Counsel's "desire for a windfall," while hinting darkly that they kept no "arms' length distance." Falkner's Bf. at 14. Falkner's unsupported attacks are contradicted by the Plaintiffs' sworn declarations as well as their actions throughout the litigation, and are inappropriate. *Cf. United States v. Kimberlin*, 898 F.2d 1262, 1266 (7th Cir. 1990) ("Lawyers who launch ad hominem attacks on . . . their adversary bring dishonor only on themselves.").

---

[23] The *Synthroid II* panel acknowledged that auctions are not always appropriate: "Lawyers will earn a competitive return even at the lower level of compensation, but the class may be worse off." 325 F.3d at 979. The panel also acknowledged a law review article post-dating *Synthroid I* that questioned auctions' utility in the class-action context. *Id*. (citing Lucian Arye Bebchuk, *The Questionable Case for Using Auctions to Select Lead Counsel*, 80 Wash. U. L.Q. 889 (2002)).

At bottom, the district court expressly found that the percentage fee sought "is consistent with the market rate" (A-12), based upon a panoply of facts that the court then discussed in some depth. *See* A-12-A-14. That express finding was rationally supported by the voluminous record; no more is required to conclude that the court acted within the permissible boundaries of its discretion. *Taubenfeld*, 415 F.3d at 600 ("In light of this record, it cannot be said that there is no evidence supporting the attorneys' fees granted.").

### 3.    This Court Rejects Arbitrary Fee Caps

The overriding theme of Falkner's Opening Brief is that the percentage awarded should not have exceeded 15% as a matter of law. *See, e.g.*, Falkner's Bf. at 12 ("the market rate is certainly less than 15%"); *id*. at 17 ("a 15% *ex ante* fee agreement would have been reasonable"); *id*. ("this Court should . . . award a market-rate fee award of no more than 15%").[24] Given this Circuit's case law, however, that theme hits some sour notes.

This Court rejects arbitrary limits on fee awards. In *Synthroid I* this Court expressly held that there is no cap applicable to "megafund" settlements, and any artificial limit on fees is inappropriate. *Synthroid I*, 264 F.3d at 718 ("disapprov[ing]

---

[24]    *See also* Liles's Bf. at 27-29.

the megafund cap").  The Court reiterated its disapproval of arbitrary caps when the *Synthroid* matter returned two years later.  *See Synthroid II*, 325 F.3d at 979 ("[t]he district court's reasons for thinking 22% too high as a benchmark are not persuasive – or at least not supported on this record"); *accord Continental Illinois*, 962 F.2d at 568 (in lodestar context where district court arbitrarily halved the requested fee, the "judge's mistake" was that he "thought he knew the value of the class lawyers' legal services better than the market did").

In contrast to the 15% cap urged by Falkner as a matter of law, this Court has approved higher percentages when warranted by the circumstances.  *See, e.g.*, *Taubenfeld*, 415 F.3d at 599 (affirming 30% award); *Synthroid II*, 325 F.3d at 980 (setting fees itself, this Court "give[s] consumer class counsel 30% of the first $10 million and 25% of the next $10 million").  District courts within this Circuit are in accord.  *See* R455:32 n.11 (collecting, in addition to *Taubenfeld*, 10 local district court securities class action opinions approving percentages ranging from 30% to 39%).

### 4.    Falkner's Cherry-Picked Cases Containing Lower Percentages Are Inapposite

Seeking to bolster his "too-high" argument, Falkner cherry-picks several other decisions in which lower percentages were awarded and/or affirmed.  Upon closer scrutiny, however, each award is explained by factors unique to the case.

758145_1

For instance, Falkner points to the only two securities cases in this Circuit to have settled for more than $200 million, citing *In re Waste Mgmt., Inc. Sec. Litig.*, No. 97 C 7709, 1999 U.S. Dist. LEXIS 16566 (N.D. Ill. Oct. 18, 1999) and *In re Sears Roebuck & Co. Sec. Litig.*, No. 02 C 7527, slip op. (N.D. Ill. Jan. 8, 2007). Falkner's Bf. at 16.[25]  He notes that in *Waste Management*, the court awarded 20% of a $220 million recovery; in *Sears Roebuck*, the court awarded 15% of $215 million. Falkner's Bf. at 16.

The circumstances specific to those cases, however, contrast with what occurred here.  Plaintiffs previously noted that the operative complaint in *Waste Management* was filed in July 1998, "based on the company's February 24, 1998 restatement of its financial statements." R455:35.  Thus, "by the time the operative complaint had been filed," the *Waste Management* defendants "**had already admitted** that [the company's] prior financial statements required a massive $1.7 billion restatement." *Id*.  "A mere five months later, in December 1998, after no apparent discovery, the parties reached the $220 million settlement." *Id*.

The *Sears Roebuck* plaintiffs also benefited from a restatement, as well as a federal investigation of the fraud.  R455:35.  That case commenced only **after** the SEC

---

[25]  *See also* Liles's Bf. at 33.

forced Sears to restate its 2002 financial statements to account for a $300 million write-off of uncollectible credit-card accounts. *Id.*; *see also* Susan Chandler, *Sears Restates Its 1st-Half Results, SEC Discovers Accounting Error; Profit Unchanged*, Chi. Trib., Oct. 3, 2002, at N1.

Here, in contrast, Plaintiffs never had the benefit of an SEC investigation that publicly identified the alleged wrongdoing prior to the action's commencement. Nor did they have the benefit of a financial restatement, or some other roadmap to the fraud; at all times Defendants vehemently denied any liability. AA-68:§II. Plaintiffs pressed allegations concerning disclosure and accounting fraud only after engaging in years of intense and risky discovery efforts and motion practice. R455:35. On their face, therefore, *Waste Management* and *Sears Roebuck* provide poor comparisons.

Falkner's remaining cases are similarly inapposite. He points to the percentages awarded from the multi-billion-dollar settlements in *Enron* and *Tyco*, heralding the "8% [*sic*] fee agreement" with class counsel in the former, and the "eventual[] . . . fee of 14.5%" in the latter. Falkner's Bf. at 14.[26]

---

[26]    The *Enron* fee was not a straight 8% fee negotiated between class counsel and lead plaintiff The Regents of the University of California. Rather, it was a graduated fee based upon the **billions** hoped to be recovered, resulting in a negotiated fee of 9.52%. *In re Enron Corp. Sec.*, 586 F. Supp. 2d 732, 741 (S.D. Tex. 2008).

To lump the three cases together as co-equal "megafund" matters simply because all three exceeded $100 million is both arbitrary and illogical. If this matter's $200 million cash settlement qualifies as a "megafund," then the multi-billion-dollar *Enron* and *Tyco* settlements are surely "mega-mega-funds," or perhaps "super-mega-funds" – pick your superlative. *See Enron*, 586 F. Supp. 2d at 740 ($7.2 billion from myriad defendants); *see also In re Tyco Int'l, Ltd.*, 535 F. Supp. 2d 249 (D.N.H. 2007) ($3.2 billion combined from Tyco and its auditor). Obviously the size of the potential and actual results in *Enron* and *Tyco* dwarf the maximum damages and settlement here. Moreover, this Court rejects the notion that fee awards should be dictated by the size of the recovery. *Synthroid I*, 264 F.3d at 718 ("disapprov[ing] the megafund cap").[27]

---

[27]    Falkner also cites *In re AT&T Mobility Wireless Data Servs. Sales Tax Litig.*, 792 F. Supp. 2d 1028 (N.D. Ill. 2011), where the same district court that approved the 27.5% fee here observed that some mean and median fee percentages in several studies ranged from 10.1% to 17.9%. Falkner's Bf. at 15. What Falkner omits, however, is that the court nonetheless awarded a 20% fee in *Mobility* while acknowledging that the award exceeded those same mean and median percentages. 792 F. Supp. 2d at 1036. The court justified the award by going through the *Synthroid I* factors (*Mobility*, 792 F. Supp. 2d at 1036-40) – just like it did here. The *Mobility* court also noted the "pertinent" common-fund decisions from "within the Seventh Circuit's jurisdiction" that awarded percentages from 20% to 38%. 792 F. Supp. 2d at 1039. Falkner also overlooks that one of the studies cited in *Mobility* noted that securities class action fee awards in this Circuit from 2006-2007, on mean and median basis, were 27.4% and 29.0% respectively. *See* Brian T. Fitzpatrick, *An Empirical Study of Class Action Settlements and Their Fee Awards*, 7 Journal of Empirical Legal Studies 811, 836 (2010).

### 5.     The District Court Acted Within Its Discretion in Choosing Not to Do a Lodestar Cross-Check

Falkner implies that the district court should have performed a lodestar "cross-check" while complaining that a "3.2 multiplier" of Class Counsel's $17.3 million lodestar is too generous. Falkner's Bf. at 16.[28] He asserts that this Court's precedents have "suggested" a lodestar-multiplier "'ceiling'" no higher than "2." Falkner's Bf. at 16. Falkner's assertion is both legally and factually mistaken.

First, Falkner's argument is built upon a false premise – namely, that a lodestar must be utilized. Contradicting that premise, this Court holds that whether a district court approaches a common-fund fee request from a lodestar or percentage perspective is discretionary. *Florin*, 34 F.3d at 566 (it is the "law of this circuit that in common fund cases, the decision whether to use a percentage method or a lodestar method remains in the discretion of the district court"); *Cook*, 142 F.3d at 1010 (same). Having chosen the percentage method, the district court was under no obligation to conduct the lodestar calculation that Falkner attempts to shoehorn into the action. *Id*. at 1013 (this Court has "never ordered the district judge to ensure that the lodestar result mimics that of the percentage approach"). Without a lodestar

---

[28]     *See also* Liles's Bf. at 36-37.

calculation required – even as a "cross-check" – any discussion of lodestar multipliers is simply irrelevant.

Second, even if a multiplier analysis were relevant to the percentage awarded, Falkner mistakenly asserts that this Court has "suggested" that a multiplier of two is an appropriate ceiling. Falkner's Bf. at 16 (citing *Cook*, 142 F.3d at 1013)). What *Cook* actually said was that the Court had "***speculated***" in a prior case that "2" was an appropriate ceiling. *Cook*, 142 F.3d at 1013 (citing *Skelton*, 860 F.2d at 258). There is a world of difference between mere "speculation" and reasoned "suggestion," however – and Falkner overlooks it. Moreover, he omits that the Court's speculation ultimately was *obiter dictum*; the *Skelton* panel concluded that "we need not decide this definitively." *Skelton*, 860 F.2d at 258. He also ignores an article that he cited below in arguing against Class Counsel's fee; that article reported that the average lodestar multiplier for cases settling above $100 million was ***4.50***, and the average multiplier for all cases was ***3.89***. *See* Logan, *et al.*, *Attorney Fee Awards in Common Fund Class Actions*, Class Action Reports 167 (Vol. 24, No. 2, March-April 2003) (attached as Ex. C to R464).

Finally, Falkner argues, without evidence or authority, that "a large percentage of the 38,000 attorney hours claimed were billed by junior attorneys whose reasonable rates should have been between $200-$250/hour." Falkner's Bf. at 16.

- 59 -

Falkner did not make this argument below. Rather, he claimed that "a large percentage of the 38,000 attorney hours claimed were billed by contract document review attorneys who were paid between $20 and $40 per hour, and who should be billed to the class at no more than $100/hour." R463:5. That claim was wrong, both factually and legally. R464:7 n.8; *see also Missouri v. Jenkins*, 491 U.S. 274, 285-89 (1989) (rejecting argument that counsel should not be compensated for the work of lower-level attorneys and paralegals at their market rate); *accord Continental Illinois*, 962 F.2d at 569 (to hold otherwise would be "unsound" and "futile").

Falkner now advances a different argument, charging that Class Counsel's lodestar is largely composed of billable hours by "junior attorneys" whose time should be billed at no more than $200-$250/hour. Falkner's Bf. at 16. Nowhere below did Falkner (or any other class member) question Class Counsel's regular hourly rates; the argument is waived. *Pole*, 570 F.3d at 937.

Even if this Court were inclined to entertain Falkner's new argument, he points to nothing in the record supporting his assertion. He cites no authority confirming "reasonable rates" are capped at $200-$250/hour. Nor could he; Falkner's suggested hourly limit has no rational relation to the complex, high-stakes litigation here, where Class Counsel litigated against accomplished attorneys hailing from several of the nation's top defense firms. It is fair to assume that *those* attorneys were not limited by

- 60 -

their clients to just $200-$250/hour – even for junior associates.  Indeed, a recent comprehensive survey of law firms shows an average $600/hour billing rate for associates working in the top quartile of law firms.[29]  Falkner's *ipse dixit* warrants no credence.

## VIII. CONCLUSION

This Court once observed that "[w]e can think of few matters more wasteful of judicial resources than ancillary litigation over an attorneys' fee award."  *Estate of Borst*, 979 F.2d at 514.  That observation is especially apt here, where the district court gave careful consideration to the issues of a reasonable fee and satisfactory class notice following nearly five years of litigation.

The district court's decisions should be affirmed.

DATED:  September 18, 2012          ROBBINS GELLER RUDMAN
                                      & DOWD LLP
                                    MICHAEL J. DOWD
                                    TOR GRONBORG
                                    JOSEPH D. DALEY
                                    TRIG R. SMITH


                                           s/ Joseph D. Daley
                                    _____
                                    JOSEPH D. DALEY

---

[29]     Lisa van der Pool, *Lawyer inflation: With economy mending, many firms return to raising rates*, Boston Business Journal (April 27, 2012).  *See* http://www.bizjournals.com/boston/print-edition/2012/04/27/lawyer-inflation-with-economy.html?page=all.

- 61 -

655 West Broadway, Suite 1900
San Diego, CA  92101
Telephone:  619/231-1058
619/231-7423 (fax)

ROBBINS GELLER RUDMAN
  & DOWD LLP
JAMES E. BARZ
200 South Wacker Drive, 31st Floor
Chicago, IL  60606
Telephone:  312/674-4674
312/674-4676 (fax)

ROBBINS GELLER RUDMAN
  & DOWD LLP
SAMUEL H. RUDMAN
58 South Service Road, Suite 200
Melville, NY  11747
Telephone:  631/367-7100
631/367-1173 (fax)

Attorneys for Plaintiffs-Appellees

## RULE 32(a)(7)(C) CERTIFICATE

The undersigned counsel certified that Plaintiffs-Appellees' Consolidated Answering Brief uses a proportionally spaced Times New Roman typeface, 14-point, and that the text of the brief comprises 13,972 words according to the word count provided by Microsoft Word 2003 word processing software.

s/ Joseph D. Daley
_____
JOSEPH D. DALEY

<u>DECLARATION OF SERVICE</u>

I, the undersigned, declare:

1.     That declarant is and was, at all times herein mentioned, a citizen of the United States and employed in the City and County of San Francisco, over the age of 18 years, and not a party to or interested party in the within action; that declarant's business address is 655 W. Broadway, Suite 1900, San Diego, California 92101.

2.     I hereby certify that on September 18, 2012, I electronically filed the foregoing document: PLAINTIFFS-APPELLEES' CONSOLIDATED ANSWERING BRIEF with the Clerk of the Court for the United States Court of Appeals for the Seventh Circuit by using the appellate CM/ECF system.

3.     I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

I declare under penalty of perjury that the foregoing is true and correct. Executed on September 18, 2012, at San Diego, California.

s/ Jana P. Kusy
JANA P. KUSY

758145_1